THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
ROBERT C. LANG, Defendant-Appellant.

Third District   No. 81-536

Opinion filed May 17, 1982.

Robert H. Jones, Ltd., of Peoria, for appellant.

Bruce W. Black, State's Attorney, of Pekin (John X. Breslin and Terry A. Mertel, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE SCOTT delivered the opinion of the court:

The defendant, Robert C. Lang, appeals from his conviction for murder following a jury trial in the Circuit Court of Tazewell County.

The facts indicate that on February 22, 1981, at 3:40 a.m., June Trewyn, a police dispatcher for the City of Pekin, received a telephone call from an unidentified caller whose whispering voice requested that a squad car be sent to 1107 Gehr Street. The dispatcher repeated the street name, spelled it and asked if that location was in the Schaferville area. The caller replied that it was and then added, "They're trying to kill me." At that point the dispatcher heard two male voices in the background and one of them shouted, "I'm going to kill her. I don't care. I'm going to kill her anyway, she's dead." The dispatcher repeated to another dispatcher, "Hurry, they're trying to kill her," and the caller responded, "Yes, hurry, hurry." The button was then pushed down by someone at the caller's end of the line so that all the dispatcher heard was a beeping sound.

A squad car was immediately dispatched to the address given by the caller and the murder victim was found shot to death. The defendant admitted that he shot his wife.

The defendant first argues that the trial court abused its discretion in admitting the testimony of the police dispatcher. The defendant alleges that the trial court improperly permitted the dispatcher to relate the substance of the call as an exception to the hearsay rule as being an excited utterance.

The law is well settled in Illinois that a statement may be admitted as an exception to the hearsay rule if it is an excited utterance. In order to establish an excited utterance it is necessary to show that there is an occurrence sufficiently startling to produce a spontaneous and unreflecting statement, the absence of time to fabricate, and the statement must relate to the circumstances of the occurrence. (*People v. Leonard* (1980), 83 Ill. 2d 411, 415 N.E.2d 358; *People v. Poland* (1961), 22 Ill. 2d 175, 174 N.E.2d 804; *People v. Robertson* (1976), 43 Ill. App. 3d 143, 356 N.E.2d 1180.) If a statement is a spontaneous declaration, then the victim's statement may be admitted in its entirety. (*People v. Wilson* (1976), 44 Ill. App. 3d 15, 357 N.E.2d 842.) The trial court is accorded a reasonable degree of latitude in determining the admissibility of statements as excited utterances. The court will be found to have abused its discretion only if the statements are not so immediately connected with the event as to indicate lack of premeditation. *People v. Cherry* (1980), 88 Ill. App. 3d 1048, 411 N.E.2d 61; *People v. Wilson* (1976), 44 Ill. App. 3d 15, 357 N.E.2d 842.

The defendant attacks the introduction of the telephone conversation for several reasons. He first argues that the person who made the phone call never identified herself and that the individual's voice was not

recognized by the police dispatcher. The defendant therefore argues that the individual was not sufficiently identified as the victim, Candy Lang, to be admissible as an excited utterance. It must first be noted that the defendant need not be identified in order for statements to be spontaneous declarations. *People v. McNeal* (1980), 88 Ill. App. 3d 20, 410 N.E.2d 480; *People v. Fields* (1979), 71 Ill. App. 3d 888, 390 N.E.2d 369.

Secondly, the circumstantial evidence strongly suggests that the victim made the phone call. The individual who made the call gave the victim's and defendant's address. The individual requested a squad car and said that "they're trying to kill me." The dispatcher heard a male voice shouting, "I'm going to kill her; I don't care." Approximately five minutes later a deputy sheriff found the victim shot at the home of the defendant and the victim. The defendant admitted that he shot his wife.

It is difficult to imagine the telephone call received by the police dispatcher as being placed by someone other than the victim. It would be coincidental indeed for a prank caller to choose the precise moment when the victim was being shot to call the police and report an impending shooting. It would be even more coincidental for that prank caller to give the victim's address. The defendant testified that he and the victim were alone in their home at the time of the crime. He did not make the call. Therefore, it is clear that the trial court did not abuse its discretion in permitting the dispatcher to testify to the substance of the phone call and permitting the People to infer that the victim made that call.

The defendant also argues that the evidence is insufficient to establish that the caller was actually excited. That argument seems to ignore the fact that the victim was found shot within five minutes of the call. It also ignores the testimony that the shouting male voice was threatening the caller with death during the telephone call. We believe that an immediate threat of death is sufficient to engender a sufficient degree of excitement to satisfy the rule.

■ The defendant also objects to the dispatcher's characterization of the caller as a female. On cross-examination the witness was not able to positively identify the whispering voice as female. The defendant did not specifically object to the testimony on this ground at trial. He has therefore waived the objection on appeal. (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.) Also, it is clear that the witness was thoroughly cross-examined by counsel at trial and the witness admitted that she could not positively identify the caller's voice as female. Thus, any error in the instant case was harmless. Furthermore, the shouting male voice heard by the dispatcher said, "I'm going to kill *her*; I don't care. I'm going to kill *her* anyway; *she's* dead." (Emphasis added.) The caller indicated that "she" was the target of that individual. The evidence is more than sufficient to conclude that the caller was female.

■■ Nor did the trial court err in permitting the dispatcher to repeat her statement to a dispatcher to "hurry, they're trying to kill her." The defendant did not specifically object to that statement at trial, the statement was an excited utterance by the dispatcher based on the frantic nature of the phone call received, and the statement was admissible to show the dispatcher's present sense impression that the caller was a female.

That the remaining requirements for an excited utterance were present is not subject to debate. Clearly there was an absence of time to fabricate in the instant case. As indicated, the statements were made within minutes of the victim's being shot and were in fact made while the victim was being threatened. Likewise, the statements made by the caller certainly relate to the circumstances of the threats made against her. For these reasons, the trial court did not err in admitting the testimony of the police dispatcher as exceptions to the hearsay rule under the doctrine of excited utterance.

The defendant next argues that the trial court erred in permitting a prosecution witness to testify as an expert witness. Apparently the defendant questions the relevance of a witness' testimony and the witness' qualifications as an expert.

The defense tried to establish that the victim and the defendant were a happily married couple who had been to a family gathering on the night in question. At that gathering several people testified that the victim and the defendant appeared normal, did not fight at the party, and had a happy marriage. Although the closing arguments were not transcribed, it appears to have been the defense's theory that defendant and the victim were happily married but had a fight on the night of the murder after leaving their relatives' party. In the defendant's version of the shooting, he procured a shotgun during the fight in order to shoot some of the victim's possessions, that a struggle ensued over the shotgun, and that the victim was accidentally shot.

The defendant testified that only he and his wife were present in the home at the time of the shooting. The defendant's father, who lived next door to the defendant, denied on cross-examination that he had ever told investigating officers that he had been over to the defendant's house on the night of the murder. The defendant's father was impeached on rebuttal with the testimony of a police officer who testified that the defendant's father told the officer that the defendant came over to his house about 3:30 a.m. and informed the father that he had shot his wife. The officer also testified that the defendant's father told him that he had been over to the defendant's house earlier, that he couldn't do any good, and had returned to his own home.

C. E. Brisbin was called by the People in rebuttal. He testified that in his opinion there were three voices other than the police dispatcher on the

tape submitted to him by the police. Obviously that testimony was relevant. The fact that there were three other voices on the tape, the victim and two males, would support the People's theory that the defendant became angry at his wife, that his wife was fearful of him, that another male individual was present, and that the defendant murdered his wife. The same evidence impeached the defendant's testimony that he was home alone with his wife at the time of the crime and that the victim was accidentally shot while she struggled with the defendant over the shotgun.

The defendant also appears to argue that the tape examined by Brisbin was not properly identified as the same tape made of the conversation between the dispatcher and the anonymous caller on February 22, 1981. By failing to object to Brisbin's testimony on that ground at trial or in his post-trial motion, the defendant has waived that objection on appeal. *People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.

■■■ The defendant contends that Brisbin was improperly qualified as an expert in the operation of recording equipment and did not possess an ability to discern the number of voices on a particular piece of tape. The defendant places particular emphasis on the fact that Brisbin did not have a degree in electronics or any formal training in the field. A trial court has broad discretion to determine the qualifications of experts and to decide what testimony would assist a jury in its deliberations. (*People v. Gordon* (1981), 94 Ill. App. 3d 764, 419 N.E.2d 66.) Irrespective of how specialized knowledge was acquired, whether through education, training, experience, or combination of each, if the witness possesses such knowledge, then he or she may testify by opinion or otherwise. (*People v. Rhoden* (1981), 101 Ill. App. 3d 223, 427 N.E.2d 1292.) Specialized formal training is not necessary; experience may qualify one as an expert. *People v. Wade* (1977), 51 Ill. App. 3d 721, 366 N.E.2d 528; *People v. Jenkins* (1974), 20 Ill. App. 3d 727, 315 N.E.2d 269.

Mr. Brisbin testified that he started in the broadcasting industry in 1968. He received approximately two months of training at a radio station in the operation of transmitting equipment. He was taught to record his own voice, to record from other tape sources, to record other people's voices, and to mix them in such a way that they would blend or stand out, depending upon the requirements of the production. In 1969 he began announcing as well as working in production studios of a radio station. It was at that time he was issued a third-class radio operator's license after successfully passing a test by the Federal Communications Commission. As part of his training, he was taught to deal with differences in frequencies of individual voices.

Subsequently, the witness was employed to sell professional recording equipment. He was trained by the owner of the company to become conversant with all levels of equipment of professional audio recording.

The witness was in fact the sales manager for the company. The witness testified that he put tapes of various people's voices together to make master tapes approximately 1,000 times and that this procedure involved dealing with the frequency of different people's voices. The witness then purchased his own studio-owned equipment. At the time of his testimony he was employed in producing television and radio commercials, sound tracks for films, and recordings of voices.

■■ Based on the above testimony, the trial court rules that Brisbin was properly qualified as an expert in the use and operation of recording equipment and in his ability to discern voice frequencies and the number of voices on a particular tape. The trial court did not err in that determination. We believe the witness had sufficient recording experience and was competent to explain the mechanical operation of the equipment and the procedure used to determined how many voices were present on that tape. *People v. Lamprey* (1979), 79 Ill. App. 3d 1065, 398 N.E.2d 1076.

The defendant next argues that the trial court erred in admitting the testimony of Carolyn Maddox, Barbara Bollinger, and Georgia Rogers in rebuttal concerning evidence of the victim's state of mind. On appeal, the defendant objects to the testimony as irrelevant and suggests that the trial court's limiting instructions on the use of the testimony were insufficient.

■■ ■ Again, it is well settled that statements which indicate the declarant's state of mind are admissible as exceptions to the hearsay rule. (*People v. Jones* (1980), 84 Ill. App. 3d 896, 406 N.E.2d 112; *People v. Johnson* (1976), 42 Ill. App. 3d 425, 355 N.E.2d 699; *People v. Fletcher* (1978), 59 Ill. App. 3d 310, 375 N.E.2d 1333.) The only requirements for their admissibility are the unavailability of the declarant and a reasonable probability that the proferred testimony is truthful. *People v. Goodman* (1979), 77 Ill. App. 3d 569, 396 N.E.2d 274; *People v. Reddock* (1973), 13 Ill. App. 3d 296, 300 N.E.2d 31.

In the instant case it was obvious that the declarant, the deceased, was unavailable to testify at trial. Likewise, there is a reasonable probability of the truthfulness of the statements. All three witnesses testified that they were friends and co-workers with the decedent at her place of employment, the telephone company. All three witnesses testified that, individually, they had a conversation with the decedent within two weeks of her death in which the decedent indicated her unhappiness in her marriage to the defendant and her intention of leaving him. Moreover, the fact that the victim individually relayed that information to three different people on different occasions supports the conclusion that there was some truth to the matter asserted. According to the witnesses, the decedent made those statements two weeks before she was shot and killed by her husband. Those statements were close enough in time to the

crime to be relevant to the decedent's state of mind on the night of the shooting.

The statements were relevant to the case because of defendant's testimony on behalf of the defense. Defense witnesses testified that the defendant and the victim had been at a family gathering on the night in question. Those witnesses testified that the defendant and the decedent were getting along fine during that gathering. The defendant's brother testified that the defendant and the decedent had a happy marriage and never argued in his presence. The defendant also testified that he had a good marriage and believed that the decedent was happy in the marriage. According to him no divorce was planned. As indicated, his testimony at trial was that the decedent was accidentally shot while she struggled with the defendant over a shotgun during a rare marital argument.

The rebuttal testimony as to the decedent's state of mind was relevant to rebut the defense testimony concerning the marital accord between the defendant and the decedent, to respond to the defendant's version of how his wife was shot, and to suggest a possible motive for the defendant's crime. *People v. Adams* (1981), 102 Ill. App. 3d 1129, 430 N.E.2d 267.

The court gave limiting instructions during the testimony of Carolyn Maddox as to the use of the state-of-mind testimony. The court gave another limiting instruction after the testimony of Georgia Rogers. The jury was again instructed on the limited use of the testimony after closing arguments. Any argument that the trial court failed to properly instruct the jury on this issue is without merit. This is especially so when defense counsel failed to tender his own limiting instruction.

In sum, it is clear that the evidence relating to the victim's state of mind was relevant, was properly admitted, and that the jury was properly instructed as to its use.

The defendant raises a question concerning the sufficiency of the evidence to prove him guilty in that portion of his brief entitled "Issues Presented for Review." However, defense counsel makes no argument concerning that issue in his brief. Apparently it is counsel's opinion that the evidence is insufficient to prove the defendant guilty of murder absent the testimony of Ms. Trewyn, C. E. Brisbin, and the evidence relative to the decedent's state of mind. As indicated above, that testimony was properly admitted and was sufficient to prove the defendant's guilt.

It must be remembered that the defendant admitted at trial and to the police that he shot his wife. The only question to be decided by the trier of fact was why the defendant shot the victim and what crime, if any, was committed. The defendant's exculpatory testimony at trial was rebutted by his statements to police officers that he was standing by the stove and his wife was standing by a heater when the gun accidentally

went off. He was also impeached with his prior statements that "he and his wife were fighting and that this fight was worse than the other ones that they had," and that "he took the safety off of the shotgun" and "the gun went off." That evidence, together with the statements contained in the phone call to the Pekin police dispatcher, was sufficient to prove the defendant guilty beyond a reasonable doubt.

Finally, the defendant raises the issue that his constitutional rights under *Miranda v. Arizona* were violated. Again, although the defendant raises this issue in his issues presented for review, he presents no argument on the same. In any event, the defendant's issue is without merit, since the defendant was not questioned by the police. Each time an officer testified that the defendant made a statement, the officer also testified that he had not questioned the defendant prior to the volunteered statement.

■■ Even if a defendant is under arrest, volunteered statements are admissible against the defendant and the police are not required to interrupt a suspect in the process of making such a statement to inform him of his *Miranda* rights. (*People v. Baer* (1974), 19 Ill. App. 3d 346, 311 N.E.2d 418.) The trial court did not err in admitting the various statements of the defendant which had been volunteered to various police personnel without questioning during investigation of Candy Lang's shotgun death.

The motion of the defendant to amend the record on appeal with a tape recording, which was taken with the case, is allowed. The allowance of this motion in no way alters the results reached in this opinion.

For the foregoing reasons, the judgment and sentence of the Circuit Court of Tazewell County are affirmed.

Affirmed.

HEIPLE and STOUDER, JJ., concur.